Filed 7/2/26  P. v. Olivo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOE DANIEL OLIVO, JR.<br><br>    Defendant and Appellant. | A171933<br><br>(Humboldt County Super. Ct. No. CR1600449C) |

Responding to a 911 call on the morning of December 14, 2014, law enforcement found 14-year-old Jesus Garcia-Romero bleeding and lying in the grass in front of a residence in Eureka, California.  Garcia-Romero had been stabbed five times in the abdomen and arms and, after being transported to the hospital, succumbed to his wounds.  Subsequent investigation, including a series of anonymous tips, revealed that the night before, three individuals—Joe Daniel Olivo, Jr., Joe Daniel Olivo III,[1] and Mario Nunez—attacked Garcia-Romero in the nearby home of Carolyn Snow.  In April 2016, the three attackers were charged with murder and a gang special allegation, along with Nicholas Leigl, who Snow had been dating and

_____

[1] We refer to Olivo, Jr., as "Olivo" and Olivo's son as "Olivo III," as did the parties.  Olivo III was 17 years old at the time of the incident but was prosecuted as an adult.

1

appeared to have facilitated their entry into the home. In August 2018, Olivo pled guilty to voluntary manslaughter in violation of Penal Code,[2] section 192, subdivision (a) and admitted he had committed the crime for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) He was subsequently sentenced to 16 years in state prison as a condition of the plea agreement.

In January 2023, Olivo filed a petition for resentencing pursuant to what is now section 1172.6,[3] which was denied after a contested evidentiary hearing. Olivo appeals the denial, arguing: (1) the court improperly relied on inadmissible evidence from the preliminary hearing in violation of section 1172.6, subdivision (d)(3) and *People v. Sanchez* (2016) 63 Cal.4th 665, 684 [requiring "case-specific out-of-court statements" cited by an expert witness to be admissible evidence, not hearsay offered without exception]; (2) the remaining admissible evidence was insufficient to prove Olivo guilty of murder beyond a reasonable doubt under any theory; and (3) the court erred in relying on a theory of felony murder to establish guilt because no underlying felony had been charged or admitted.

Focusing on the felony-murder challenge, we disagree with Olivo's contentions because an underlying felony need not be separately charged to be considered a qualifying offense for a felony-murder conviction. Thus, because substantial evidence establishes Olivo's guilt beyond a reasonable doubt even excluding the evidence Olivo now challenges as improperly considered hearsay, we affirm.

---

[2] Further unspecified statutory references are to the Penal Code.

[3] Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10.)

# BACKGROUND

## I. *The 2016 Preliminary Hearing and 2018 Plea Agreement*

Three witnesses testified at the 2016 preliminary hearing relied upon by the court at the 2023 evidentiary hearing held pursuant to section 1172.6: Carolyn Snow, Detective Ronald Harpham, and Agent Paul Sprague. We discuss their testimony in turn.

### A. *Carolyn Snow*

Around 10:30 or 11:00 p.m. on December 16, 2014, Snow arrived home to her locked apartment to find Michael Grant and Garcia-Romero inside. Garcia-Romero was 14 years old and "a runaway" who "came across" Snow's house when he was "left behind by some of his friends" and "was so young . . . it was hard to tell him to leave."

On this night, Garcia-Romero and Grant were helping Snow pack her belongings to move. Snow thought they were "acting a little strange." Garcia-Romero was "talking a little crazy" and told Snow that "people were out to get him." When Snow first got home, she saw Garcia-Romero "had a knife in his hand, and so did [Grant]." Garcia-Romero said he had a knife because "people were coming to get them" and "were coming after them."

Shortly after her arrival, Snow "either called [Leigl], or he called [her]," and about 20 or 30 minutes later, Leigl knocked on her back door. When Snow opened the door, Leigl entered, and three other males followed. When the men entered, Snow thought Garcia-Romero was in her bedroom, "one of the first rooms . . . or in the hallway area." She and Leigl rejoined Grant in the back bedroom, and Snow "[i]mmediately" heard a "small scuffle, and then [Garcia-Romero] crying." Snow saw "everyone [run] out the back." Garcia-Romero "came out to the hallway area, and he was holding [onto] his stomach" and said "that he had been stabbed. . . . [H]e asked me if I believed

3

him now." Grant moved Garcia-Romero to Leigl's car—the only car there—demanding Leigl take Garcia-Romero to the hospital. The car left, and Snow remained at the apartment.

In response to questioning, Snow testified that she knew Leigl was a gang member but denied knowledge of which gang or his level of involvement. She did not remember if Garcia-Romero had asked her "to make sure [Leigl] was alone" when he came to the apartment. Nor did she remember telling Harpham, "that one of the individuals was carrying a knife." Snow further testified that although she recalled looking at photographs of people during her interview with Harpham, she did not recall identifying the three males who entered her home and stated, "I don't remember saying anything that I could identify them. He showed me pictures. I didn't say I knew who they were."

## B. *Detective Ronald Harpham*

At 8:30 a.m. on December 17, 2016, Harpham responded to a reported stabbing at a location "about halfway" between Snow's apartment and the hospital; a witness found Garcia-Romero lying in the grass in front of a neighbor's house. A photograph admitted into evidence showed blood around Garcia-Romero's waistline and puncture wounds visible in his chest. An ambulance transported Garcia-Romero to the hospital where he was pronounced dead.

In the days after the stabbing,[4] Harpham received an anonymous tip representing that Olivo and Olivo III "were involved." On December 19 and 23, Harpham received three anonymous letters that were "exact duplicates" and stated the stabbing "occurred at . . . Carolyn Snow's house," Leigl had

---

[4] The record does not specify exactly when, but Harpham received the telephone tip before he received the first anonymous letter.

4

transported the wounded Garcia-Romero in a black Volvo, and Olivo, Olivo III, and Nunez were the perpetrators.[5] Subsequent searches of Snow's apartment and Leigl's vehicle revealed blood belonging to Garcia-Romero.

When Harpham interviewed Snow on February 11, 2015, she stated she knew of Nunez and Olivo, but "didn't really know" Olivo III. Harpham showed Snow photographs of Olivo, Olivo III, and Nunez, and Snow identified them as the people who followed Leigl into her apartment on December 16. Snow also told Harpham she saw Olivo III enter her apartment with a knife. Harpham testified that during the interview Snow was crying and was "very much afraid to make these identifications."[6]

Harpham also attended the autopsy of Garcia-Romero and observed he had a total of five stab wounds: three in the abdomen, one in the forearm, one in the armpit. In describing the wounds, Harpham did not testify that he observed any bruises or contusions. The pathologist told Harpham there were no "drag marks" around the wounds and noted the same in the autopsy report. Harpham asked the pathologist to explain what the absence of drag marks meant, and the pathologist explained, "somebody may have been holding" Garcia-Romero because, "if a person is trying to stab someone . . . there is a lot of dynamic activity of the body being moved

---

[5] None of the letters were admitted into evidence because, as the court explained, "I mean certainly it caused this officer to take certain actions, and he testified to what those are, but they wouldn't be received by the court for the truth of the matter. . . . [S]o I think at this point absent some additional authority in regards to the matter, the court will not receive the anonymous letter into evidence."

[6] Harpham also interviewed Grant, who reportedly identified Nunez and Olivo by their gang nicknames, but his statement was testified to at the preliminary hearing pursuant to section 872, subdivision (b) so was not considered by the court at the section 1172.6 evidentiary hearing; we therefore do not discuss it further.

5

violently. . . . [W]hile the repeated knife pokes were occurring, there was some stability being maintained on [Garcia-Romero]."

### C. *Agent Paul Sprague*

Sprague is a special agent with the Department of Corrections and Rehabilitation who testified as a gang expert. Based on packets of information prepared by the People including photographs of the defendants, their criminal histories, and social media posts attributed to the defendants, Sprague opined that Leigl, Olivo, and Nunez were active members of the Sureños criminal street gang, and Olivo III was an "active associate." Sprague deduced that Olivo III had been disrespected by Garcia-Romero, thus per gang rules, the attack was to "deal[] with somebody who had said something disrespectful." Sprague therefore concluded that the stabbing was "committed for the benefit of, or the direction or, or in association with . . . [the] gang, and with the specific intent to promote further or assist in any criminal conduct by [the] gang" because the "magnitude of the crime that was committed is meant to instill fear in rivals and in the community members, so the most practical benefit is enhancing the gang[']s reputation."

### D. *The 2016 Information and 2018 Plea*

Olivo and his codefendants were held to answer, and the felony information filed on April 11, 2016, alleged Olivo, Leigl, Nunez, and Olivo III committed the malice aforethought murder of Garcia-Romero (§ 187, subd. (a); count 1) and committed the special allegation of intentionally killing Garcia-Romero while they were active members in a street gang and to further the activities of the street gang (§ 190.2, subd. (a)(22)).[7]

---

[7] The information included an additional special allegation that Olivo III was a minor who was at least 16 years of age at the time of the commission of the charged offense.

6

On August 29, 2018, Olivo entered into a negotiated disposition, pleading guilty to a lesser included offense of voluntary manslaughter (§ 192, subd. (a)) and a gang enhancement (§ 186.22, subd. (b)(1)(C) ["a person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members"]) in exchange for dismissal of the charged murder and special allegation.[8]  Olivo and all counsel stipulated that "the Court may consider the preliminary hearing as setting forth the factual basis for the plea."  The court accepted the factual basis, found Olivo guilty of voluntary manslaughter with the specified gang enhancement, and sentenced him to the stipulated sentence:  the middle term of six years for voluntary manslaughter and 10 years on the gang enhancement for a total term of 16 years with credit for time served.

## II.  *The Section 1172.6 Petition for Resentencing*

On January 23, 2023, after the enactment of section 1172.6, Olivo filed a petition for resentencing.  The court found a prima facie showing had been made and set the matter for evidentiary hearing on August 20.

At the hearing, the People introduced into evidence the preliminary hearing transcript and Olivo's plea form.[9]  They asserted Harpham's preliminary hearing testimony regarding Snow's statements was admissible

---

[8] On the same date, Nunez entered into an identical plea agreement, and Olivo III pled "open" to voluntary manslaughter with an added enhancement for the personal use of a knife (§ 12022, subd. (b)(1)).  (At some point not specified in the record, Leigl's case was severed from the codefendants after his section 995 motion was granted.

[9] The People also called a district attorney investigator to testify as to Snow's statement to him and Harpham after the preliminary hearing explaining why she declined to identify the defendants at the preliminary hearing, but the testimony was stricken as hearsay.

because Snow's own preliminary hearing testimony had been inconsistent with her prior statements to Harpham. The People also maintained Harpham's testimony about his personal observations, including his viewing of the autopsy, was admissible as direct evidence.

Olivo argued the preliminary hearing transcript would "drastically need to be limited in this case" and was "just chalked full of objectionable testimony and evidence." Specifically, Olivo objected to Harpham's testimony about the absence of drag marks around the stab wounds and its significance as lacking foundation. He further complained that Sprague's testimony was barred by *People v. Sanchez, supra*, 63 Cal.4th 665, because he relied on case specific type information that was "not presented in admissible form during the preliminary hearing." The People agreed that the court will "have to ignore anything that is hearsay under [section 872, subdivision (b)] and would not be admissible."

The court took the matter under submission and issued a written order on November 13, 2023, denying the petition. The court found that Olivo was a " 'major participant' " in Garcia-Romero's killing and that he " 'aided and abetted' " in the killing as described in section 1172.6 et seq. Citing *People v. Davenport* (2023) 95 Cal.App.5th 1150 for the principle that "the preliminary hearing transcript is admissible at the hearing on the merits," the court distinguished the inadmissible hearsay evidence and opined, "Had the merits hearing transpired only by the evidence of the investigating officer, testifying under [section] 872 rules of evidence as to preliminary hearings, the case would be far more favorable" to Olivo, but here the section 1172.6 hearing "was 'live,' " with Snow, Sprague, and Harpham all testifying. The court emphasized Snow's "selective memory" and "selective amnesia," when testifying at the preliminary hearing and explained, "here, Ms. Snow

8

inadvertently 'let slip' her actual memory of the incident making her preliminary hearing statements unquestionably inconsistent with her statements to Detective Harpham." The court found Snow had "tremendous recall" of the incident in her apartment but her "obviously evasive" testimony "regarding her previous identification" of Olivo created an inconsistency that rendered her prior statement to Harpham "admissible pursuant to Evidence Code [sections] 1235 and 770."

The court made a series of "findings of fact . . . gleaned from the preliminary hearing" including that when Olivo and his son, Olivo III, entered the residence, Olivo III "openly carried a knife," and they " 'made a bee line' " to Garcia-Romero. Within the next 30 seconds, Snow heard a scuffle and Garcia-Romero "cry out" before Olivo, Olivo III, and Nunez "quickly retreated" from the apartment. Under these circumstances, the court stated it could "reasonably infer that [Olivo], an active gang member and the Father of the actual killer . . . would have been aware that his son carried a knife, that the victim was not random, and that harm to the victim was the purpose of their immediate and instant attack on the victim." The court also found, "Along with his proximity to the killing, it can be reasonably inferred that [Olivo] intended to aid and abet those acts and that he participated in the assault" which occurred with "obvious determination." The court stated that the absence of " 'drag marks,' " which suggested "that [Garcia-Romero] was being held during the attack and was not free to fight back" was "not dispositive," but, "under an aiding and abetting totality of the circumstances evaluation, it is nevertheless relevant." The court stated Olivo "was in a position to prevent the actual murder, however, as the adult parent of the juvenile actual killer, [Olivo] instead facilitated the murder." The court accepted Sprague's expert opinion that Olivo and his son were active Sureños

9

gang members, the crime was for the benefit of the gang, and that Garcia-Romero's injuries "were consistent and in keeping with the policies of Sureños regarding retaliation for disrespect." The court concluded that under the current law pursuant to "[section] 189[, subdivision] (e)(2) and (e)(3), the conviction as to [Olivo] does remain viable, and by proof beyond a reasonable doubt and as discussed herein, [Olivo] aided and abetted, was a major participant in, and acted with reckless indifference to human life in the killing of Jesus Garcia-Romero."

Olivo timely appeals.

## DISCUSSION

Olivo's appeal centers around the premise that the trial court improperly relied on hearsay evidence from the preliminary hearing in denying his petition, and the remaining admissible evidence was insufficient to prove his guilt under current law. Olivo further contends he cannot be found guilty under a felony-murder theory because no underlying felony was separately charged.

But this latter contention is incorrect; it is well settled that a crime that forms the basis of a felony-murder theory of liability need not be separately charged. (*People v. Thomas* (1987) 43 Cal.3d 818, 829, fn. 5 ["it has long been the law in this state that an accusatory pleading charging murder need not specify degree or the manner in which the murder was committed. [Citations.] [E]ven where the People intend to rely on a felony-murder theory, the underlying felony need not be pleaded in the information"].) And a review of the record without consideration of the evidence Olivo contends was improperly admitted at the evidentiary hearing demonstrates that substantial evidence supports the trial court's determination that Olivo was guilty of felony murder under section 189,

10

subdivision (e)(3) beyond a reasonable doubt because he was a major participant in a qualifying felony and acted with reckless indifference to human life.[10]  As such, any potentially erroneous consideration of the challenged evidence was not prejudicial, so we need not reach Olivo's evidentiary claims of error.

## I.  *Legal Framework*

### A.  *Standard of Review*

In reviewing a trial court's denial of a resentencing petition under section 1172.6, we review factual findings for substantial evidence, and we review de novo the court's application of the law to those facts.  (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.)  Applying this standard of review, we may only ask whether the appellate record contains "evidence that is reasonable, credible, and of solid value . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)  We " ' "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.]  Substantial evidence also ' "includes

---

[10] Because Olivo's briefing focuses on felony murder under section 189, subdivision (e)(3), which requires proof that Olivo "was a major participant in the underlying felony and acted with reckless indifference to human life," so do we, even though the court also found Olivo's conviction viable under section 189, subdivision (e)(2), as an aider and abettor of the actual killer, and appeared to make an implied finding that Olivo was guilty of aiding and abetting implied malice murder.  (*People v. Smithey* (1999) 20 Cal.4th 936, 972 [appellate court upholds a trial court order if it is supported by any legally correct theory]; *Smyth v. Berman* (2019) 31 Cal.App.5th 183, 196 ["we may affirm on any ground supported by the record"]; *People v. Lamb* (2024) 16 Cal.5th 400, 435, fn. 13 [the court need not address arguments where the court's conclusion on another issue is dispositive].)

11

circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

**B.** *Resentencing Under Section 1172.6*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.), narrowing the felony-murder rule significantly for defendants who were not actual killers, eliminating second degree murder liability based on the natural and probable consequences doctrine (*People v. Strong* (2022) 13 Cal.5th 698, 703, 707, fn. 1 (*Strong*)), and providing a resentencing procedure by which those previously convicted of murder could petition to have their convictions set aside. (*People v. Lewis* (2021) 11 Cal.5th 952, 959; § 1172.6.) In enacting section 1172.6, "the Legislature amended the murder statutes so that felony-murder liability for persons who were not actual killers is now limited to (1) 'those who, "with the intent to kill," aid or abet "the actual killer in the commission of murder in the first degree" ' and (2) those who . . . 'were "major participant[s] in the underlying felony and acted with reckless indifference to human life." ' ([*Strong*, at p.] 708, quoting § 189, subd. (e)(2) and (3); see § 188, subd. (a)(3).)." (*People v. Underwood* (2024) 99 Cal.App.5th 303, 306, fn. omitted.)

As applied here, an individual previously convicted of manslaughter who believes he could not have been found guilty of the charged homicide under current law may file a petition with the court to have the conviction vacated and be resentenced on any remaining counts "when all of the following conditions apply": (1) an information was filed that allowed the prosecution to proceed "under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime"; (2) the petitioner "accepted a plea offer in lieu of a trial at which the

petitioner could have been convicted of murder or attempted murder"; and (3) the petitioner "could not presently be convicted of murder or attempted murder" because of changes to section 188, defining malice, and section 189, listing the predicate felonies for first degree felony murder. (§ 1172.6, subd. (a); *People v. Vargas*, *supra*, 84 Cal.App.5th at p. 950.)

If the petitioner makes a prima facie showing he is entitled to relief, "the court shall issue an order to show cause" and thereafter conduct an evidentiary hearing where, "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under the amended California law. (§ 1172.6, subds. (c) & (d)(3).) At such hearing, the court may consider all previously admitted evidence, including a defendant's admissions as part of a guilty or no contest plea, because a defendant "cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict." (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458 [a guilty plea " 'amounts to an admission of every element of the crime and is the equivalent of a conviction' "].) However, stipulating to documents or transcripts as a factual basis for a plea "is not a stipulation to the admissibility of those documents at a section 1172.6 evidentiary hearing." (See *People v. Dixon* (2026) 118 Cal.App.5th 116, 128.) Nor is such a stipulation an admission as to the truth of any statements in the documents. (See *People v. French* (2008) 43 Cal.4th 36, 52.)

Moreover, "hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6, subd. (d)(3); see also *People v. Davenport*, *supra*, 95 Cal.App.5th at pp. 1158–1159 [holding that the

13

preliminary hearing identification of petitioner as the shooter was admissible hearsay at a § 1172.6 evidentiary hearing because the testimony had not been introduced pursuant to § 872, subd. (b)].)

### C. *Relevant Murder Liability Principles Under Current Law*

As noted, although "the new felony-murder rule sets forth three theories of liability," *People v. Morris* (2026) 19 Cal.5th 671, 680, we address only the theory of first degree felony murder for a nonkiller who was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[11] (§ 189, subd. (e)(3).) Only certain enumerated felonies may serve as a basis of first degree felony murder liability under section 189, subdivision (e): "arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 287, 288, or 289, or former Section 288a . . . ." (§ 189, subd. (a).)

A defendant is a "major participant" where the circumstances show he was "substantially involved in a course of conduct that could be found to entail a likelihood of death." (*People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*).) *Banks* suggests a series of questions courts may consider in

---

[11] Section 190.2, subdivision (d) provides: "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4 [concerning special circumstances]."

assessing participation,[12] but "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison v. Arizona* [(1987)], 481 U.S. [137,] 157) was sufficiently significant to be considered 'major.' " (*Banks*, at p. 803.)

In determining if one acts with "reckless indifference" we must analyze the " 'totality of the circumstances.' " (*People v. Emanuel* (2025) 17 Cal.5th 867, 875, 885 (*Emanuel*).) "[R]eckless indifference encompasses both subjective and objective elements. [Citations.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' [Citations.] 'As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " ' " (*Id.* at p. 884.) Similar to *Banks*, in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our high court " 'set out a nonexhaustive list of considerations relevant to [the reckless

---

[12] "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

15

indifference] determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' " (*Emanuel*, *supra*, 17 Cal.5th at pp. 884–885; *Clark*, at pp. 618–623.) " ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Emanuel*, at p. 885.)

As such, there is often a " ' "significant[ ] overlap" ' " in the factors in determining if one is a major participant or is acting with reckless indifference. (*Strong*, *supra*, 13 Cal.5th at p. 706.) In fact, " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)

## II. *Sufficiency of the Evidence Presented*

Olivo specifically challenges the court's asserted reliance on four areas of evidence he claims are inadmissible: (1) Harpham's testimony at the preliminary hearing as to Snow's prior statements to him; (2) Harpham's testimony about the nature of the stab wounds and their significance; (3) Harpham's testimony regarding the gang membership of the defendants and "various witnesses"; and (4) Sprague's opinion testimony concerning the gang membership of the defendants and the gang-related motivation for the killing. He argues the remaining admissible evidence was insufficient to support the court's finding that he was guilty beyond a reasonable doubt of the charged murder, particularly when the court could not find him guilty of

felony murder because no underlying felony had been charged. We are not persuaded.[13]

To start, the Attorney General contends that Olivo "misstates the substantial evidence standard, which requires review of all admitted evidence, not just the admissible evidence." We agree that " '[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission.' " (*People v. Jasso* (2015) 17 Cal.5th 646, 684 quoting *People v. Navarro* (2021) 12 Cal.5th 285, 311; *McDaniel v. Brown* (2010) 558 U.S. 120, 131 [in analyzing sufficiency of the evidence, " 'a reviewing court must consider all of the evidence admitted by the trial court' regardless of whether that evidence was admitted erroneously"].) And we conclude substantial evidence supports the court's determination that Olivo was guilty beyond a reasonable doubt of murder under a felony-murder theory of liability because the evidence demonstrates that Olivo participated in a coordinated burglary and stabbing of Garcia-Romero that posed obvious risks of lethal violence for the benefit of

---

[13] We address summarily Olivo's collateral assertions that the court made findings not supported by the record because they lack merit. Olivo challenges the court's finding that Snow observed "Olivo III . . . 'openly carrying' " a knife. But Harpham's testimony that Snow told him that she observed the knife demonstrates the knife was out in the open to be observed.

Olivo further challenges as unsupported the court's finding that Olivo " 'and his two co-defendants entered the bedroom solely occupied by the victim' " and "made a beeline to the room occupied" by Garcia-Romero. Again, the record contradicts these contentions because Snow testified Garcia-Romero was in her room, "the first room," and stepped into the hallway after being stabbed. Harpham was asked if the perpetrators "made a direct beeline" for Garcia-Romero, and he responded, "They would have had to, yeah." But even assuming error, the precise location of Garcia-Romero and the assailants at the time of the stabbing is irrelevant to our analysis.

his gang, and Olivo failed to take any steps to prevent the stabbing.  (§ 189, subd. (e)(3).)

But we still must consider Olivo's evidentiary and legal challenges because the different analyses carry different consequences.  If the court's denial of the section 1172.6 petition had not been supported by substantial evidence, even considering any erroneously admitted evidence, the consequence is then that "the petitioner shall be resentenced on the remaining charges" because "the prosecution [has failed] to sustain its burden of proof."  (§ 1172.6, subd. (d)(3); *Emanuel, supra*, 17 Cal.5th at p. 896 [ordering resentencing be granted on remand where substantial evidence did not support denial of § 1172.6 petition].)  Conversely, if our conclusion is that substantial evidence supports the conviction and includes the consideration of erroneously admitted evidence, we must assess whether the trial court's reliance on such evidence was prejudicial.  If the reliance was prejudicial— meaning there was not substantial evidence to support the conviction absent the consideration of the erroneously admitted evidence—then, because petitioner received a defective judicial process, the appropriate remedy is to remand for a new evidentiary hearing where the prosecutor may again attempt to prove guilt but with admissible evidence (unless there is a stipulation to a lesser conviction).  (See *People v. Dixon, supra*, 118 Cal.App.5th at p. 137 & fn. 3 [prejudicial evidentiary errors warrant remand for a new evidentiary hearing rather than remand for resentencing]; § 1172.6, subd. (d)(3).)

## A.  *The Underlying Felony*

As stated, we disagree with Olivo's contention that because  "there was no underlying felony charged or admitted" the court may not consider a theory of felony murder.  "So long as the information adequately alleges

18

murder, the evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution's theory regarding the manner and degree of killing," thus "even where the People intend to rely on a felony-murder theory, the underlying felony need not be pleaded in the information." (*People v. Thomas, supra,* 43 Cal.3d at p. 829, fn. 5; see *People v. Arellano* (2024) 16 Cal.5th 457, 474, fn. omitted, quoting § 1172.6, subd. (e) ["Where, as here, the murder was charged generically—and the target offense or underlying felony was not charged—the murder shall be redesignated 'as the target offense or underlying felony for [section 1172.6] resentencing purposes' "].)

Here, the evidence presented at the preliminary hearing clearly demonstrates the prosecution's plan to proceed on a theory of felony murder based on burglary with intent commit an assault with a deadly weapon as the underlying felony. (§§ 459, subd. (a) ["Every person who enters any house, room, apartment . . . with intent to commit . . . any felony is guilty of burglary"], 245, subd. (a)(1) [assault with a deadly weapon is a felony].) Olivo and two of his co-participants entered Snow's apartment uninvited, carrying a knife, and proceeded directly to Garcia-Romero, demonstrating their coordinated intent. (*People v. Therman* (2015) 236 Cal.App.4th 1276, 1279 [" ' "We imply all findings necessary to support the judgment" ' "].) Because burglary is enumerated under section 189, subdivision (a), the court could rely on it to find guilt on a theory of felony murder. (§ 189, subd. (e).)

**B.  *Evidence Challenged as Inadmissible Not Prejudicial***

Next, for the purpose of our discussion, we assume the evidence Olivo challenges—Harpham's testimony as to Snow's prior statements to him, Harpham's testimony about the nature of the stab wounds, Harpham's testimony regarding gang membership, and Sprague's opinion testimony—

19

was improperly relied on and do not consider it in our sufficiency of the evidence analysis so that we can directly assess any potential prejudice that might warrant remand. (See *People v. Henley* (2022) 85 Cal.App.5th 1003, 1020 [assuming without deciding, but applying *Watson* prejudice standard in reviewing denial of resentencing under § 1172.6].) In order to demonstrate prejudice, Olivo must show it is reasonably probable he would have obtained a more favorable result had the challenged testimony been excluded. (*People v. Watson* (1956) 46 Cal.2d 818; *People v. Lewis*, *supra*, 11 Cal.5th at p. 973 ["Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies' "].) For reasons we articulate below, we conclude that substantial evidence supports the trial court's determination that Olivo was a major participant and acted with reckless indifference to human life even without consideration of the testimony he challenges. This sufficiency of evidence means that any court consideration of the challenged evidence was not prejudicial, and we need not reach Olivo's specific claims of error.

## C. *Major Participant*

Viewing the record in the light most favorable to the trial court's ruling, Olivo was a major participant in the burglary. (§ 189, subd. (e)(3).) Snow's testimony at the preliminary hearing demonstrates Olivo's intentional and coordinated involvement in the assault on Garcia-Romero. Leigl spoke with Snow prior to his arrival at the apartment. After Snow opened the door to grant Leigl entry, Olivo, Olivo III, and Nunez, who were not initially visible, immediately followed and walked directly to Garcia-Romero's location, where he was stabbed five times before the three quickly left. They were in the apartment less than 30 seconds. This focused and coordinated entry, attack, and flight that involved his own son demonstrates that Olivo was a major participant in the killing.

In addition, in entering his plea of guilt, Olivo admitted he committed the killing for the benefit of the gang. The court could properly consider this admission and its implication that Olivo and codefendants were members or associates in a gang. (See *People v. Rodriguez, supra*, 103 Cal.App.5th at p. 458.) These circumstances further support the inference that Olivo participated in the planning of the stabbing, and this was not a random assault.

Further, even setting aside the challenged testimony that Snow told Harpham she observed Olivo III with a knife and Olivo III's plea to the personal use of a knife, Olivo had an awareness of the "particular dangers posed by the nature of the crime" because the evidence permits a reasonable inference that the group arrived armed with a knife given the speed with which the stabbing occurred, as evidenced by the immediate cries of Garcia-Romero, the lack of bruises or contusions which would suggest a more extended physical fight, and the expedited exit of the trio. (*Banks, supra*, 61 Cal.4th at p. 803.) Moreover, a stabbing carries a high risk of death, particularly when the attack involved three assailants, including two adult men, against one vulnerable 14-year-old boy.

In addition, testimony regarding the absence of "drag marks" is not necessary to a murder conviction where, as here, five stabbings (including puncture wounds) in less than 30 seconds supports the inference of a short, coordinated effort. The location of the stabbing in the "first room" or hallway by the three individuals who entered together allows a reasonable inference that Olivo was part of the effort to ensure the attack was successful. The nature of entry, Olivo's presence at the scene, and his status as Olivo III's father further put Olivo both "in a position to facilitate or prevent the actual murder." (*Banks, supra*, 61 Cal.4th at p. 803.)

21

Finally, Olivo's expeditious exit, again with his son and Nunez, demonstrates his knowledge of a plan to enter, assault, and flee, which was in fact the uncontested evidence before the court. (*People v. Price* (2017) 8 Cal.App.5th 409, 458 ["Flight may show consciousness of guilt or it may not, but . . . evidence of flight has *no* tendency to establish innocence"].) In sum, substantial evidence supports a finding that Olivo was "substantially involved in a course of conduct that could be found to entail a likelihood of death" and, thus, was a major participant in the burglary that resulted in Garcia-Romero's death. (*Banks*, *supra*, 61 Cal.4th at p. 802.)

**D.  *Reckless Indifference***

We next use the *Clark* factors to ascertain if Olivo acted with "reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).) First, as above, setting aside Snow's testimony that Olivo III carried a knife upon entry and ignoring Olivo III's admission of the personal use of a knife in the killing, we can infer from the record that he was armed with a knife because a bladed instrument was used to stab Garcia-Romero, who was seen with five stab and puncture wounds about his abdomen and arms. It is reasonable to infer, even without consideration of Olivo III's own admission, that Olivo was aware someone in his cohort was armed both because of the nature of his relationships with Olivo III and Nunez, their coordinated entry, and the speed of the attack.

In addition, Olivo was physically present throughout the crime, and the record includes no evidence that suggests Olivo took steps to prevent the stabbing or minimize the harm to Garcia-Romero. To the contrary, he actively rushed through the apartment with his cohort and admitted he aided in the killing of Garcia-Romero for the benefit of his street gang. (*Clark*, *supra*, 63 Cal.4th at p. 617 [reckless indifference "encompasses a

willingness . . . to assist another in killing . . . to achieve a distinct aim, even if [he did] not specifically desire that death as the outcome of his actions"].) Moreover, although it took less than 30 seconds to enter the apartment, locate and stab Garcia-Romero, and leave, the presence of two uninvolved bystanders in the residence—Snow and Grant—"heighten[ed] the risk of violence beyond that inherent in the" burglary itself. (*Emanuel*, *supra*, 17 Cal.5th at p. 886.)

Finally, Olivo's admission he committed the crime for the benefit of the gang to which he belonged rendered Sprague's opinion as gang expert unnecessary from a sufficiency of the evidence perspective. (See *Clark*, *supra*, 63 Cal.4th at p. 621 ["A defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death' "].) Therefore, substantial evidence supports a finding that Olivo "knowingly engage[d] in criminal activities known to carry a grave risk of death" and, thus, acted with reckless indifference to human life in the burglary. (*Emanuel*, *supra*, 17 Cal.5th at p. 884.)

In sum, even without consideration of the challenged evidence, the record presented at the evidentiary hearing, when viewed "in the light most favorable to the judgment" with "all reasonable inferences" drawn in favor of the court's determination, shows substantial evidence supports the court's finding as to Olivo's guilt for murder under a felony-murder theory of liability beyond a reasonable doubt. (*People v. Davis* (2024) 107 Cal.App.5th 500, 509–510; § 189, subd. (e)(3).) The court properly denied Olivo's resentencing petition.

23

## DISPOSITION

The trial court's order denying Olivo's 1172.6 petition for resentencing is affirmed.

DESAUTELS, J.


We concur:


STEWART, P. J.


MILLER, J.


*People v. Olivo, Jr.* (A171933)